# HOLDEN *v.* UNITED STATES.*

---

CRIMINAL LAW AND PROCEDURE; JURISDICTION; POLLUTION OF POTOMAC
.          RIVER; STATUTORY CONSTRUCTION.

1. The jurisdiction of the court in which an information or indictment is found is not impaired by the manner in which the accused is brought before it; and a party must be taken to know and understand the effect of his appearing, pleading to and going to trial upon the information or indictment.

2. Where a defendant in the police court appeared to an information and pleaded not guilty, and waived trial by jury, and it was developed during the trial that the information was a substitute for a former

---

*Water—Pollution.*—For a full presentation of the authorities relating to the pollution of water as constituting a nuisance to fisheries, see editorial note to *People* v. *Truckee Lumber Co.* 39 L. R. A. 589.

As to pollution of water in general, see the presentation of the authorities in the following editorial notes: Prescriptive right to pollute, note to *Charnley* v. *Shawano Water Power & River Improv. Co.* 53 L. R. A. 895, 903; municipal power over, note to *State* v. *Clarke,* 39 L. R. A. 681; municipal regulation of nuisance affecting health, note to *Harrington* v. *Board of Aldermen of City of Providence,* 38 L. R. A. 324; contamination of underground stream, note to *Southern Pac. R. Co.* v. *Dufour,* 19 L. R. A. 92; how far stream may be polluted for mining purpose, note to *Drake* v. *Lady Ensley Coal, Iron, & R. Co.* 24 L. R. A. 64; right of municipal corporation to drain sewage into waters, note to *Platt Brothers & Co.* v. *Waterbury,* 48 L. R. A. 691.

D. C.]                             Syllabus.

information for substantially the same offense, to which he had plead-
ed not guilty and demanded a jury trial, but which information had
been withdrawn, a motion thereupon made by him that he be dis-
charged from further prosecution on the ground that he had no knowl-
edge of the filing of the second information; that there had been no
service of process upon him; that counsel had no authority to plead to
such information; and that they supposed the plea was to the original
information, with an offer to prove such facts,—was properly overruled.

3. In a prosecution in the police court of the superintendent of a gaslight
company for allowing water mixed with tar and oil from the works of
his company to flow into the Potomac river, in violation of sec. 901, D.
C. Code, providing that no person shall allow any tar, oil, etc., or any
waste products of any gas works to flow into the Potomac river, that
court properly adopts a proposition of law (a jury trial having been
waived) submitted on behalf of the prosecution, to the effect that, if
the defendant violated the statute, he was guilty, and properly rejects
propositions of law submitted by the defendant to the effect that the
defendant was to be acquitted if the product so allowed by him to
escape into the river was injurious to fish, or if the accused had used
reasonable diligence in eliminating the waste products of tar and oil
from the water he had so discharged, or if he had so discharged only
so much of such waste product as was required to be discharged for the
necessary operation of the gas works; and that the statute does not
apply to the necessary operation of such gas works.

4. In construing a statute, prior statutes may be resorted to to solve, but
not to correct, an ambiguity; and where a statute is clear upon its
face, and when standing alone, is fairly susceptible of but one con-
struction, that construction must be given to it.

5. In enacting sec. 901, D. C. Code, prohibiting the discharge of waste
products into the Potomac river, it was the object of Congress, not
simply to provide for the protection of fish in the river, but to keep
the river as free from pollution as possible.

6. Section 901, D. C. Code, prohibiting the discharge of waste products
of gas works and other works into the Potomac river within the Dis-
trict of Columbia, being plain and unambiguous in its meaning, the
fact, if it be a fact, that its literal enforcement will virtually ren-
der it impracticable to manufacture gas for the use of the city of
Washington will not justify the court in refusing to so enforce it.

No. 1323.   Submitted October 11, 1904.   Decided December 13, 1904.

In error to the Police Court of the District of Columbia.
                                                   *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. R. Ross Perry* and *Mr. R. Ross Perry, Jr.,* for the plaintiff in error:

1. The act (D. C. Code, § 901), being a penal one, is to be strictly construed, and all doubts resolved in favor of the defendant. *Parry* v. *Croydon,* 109 E. C. L. 568; 23 Am. & Eng. Enc. Law, p. 375; *Bolles* v. *Outing Co.* 175 U. S. 262; *United States* v. *Harris,* 177 U. S. 305. All parts of a statute should be considered together, and not one part by itself. Endlich, Interpretation of Statutes, p. 35; 23 Am. & Eng. Enc. Law, p. 306; *Rygate* v. *Wardsboro,* 30 Vt. 746. And if any doubt can exist as to the meaning of the provisions, it is proper to look to the title of a statute and to pre-existing law, and the reason and purpose of a new enactment. *Smythe* v. *Fiske,* 23 Wall. 380.

2. It is evident that, considering sections 896–903, D. C. Code, together and in connection with the previous law, their intent is solely to protect fish and spawning. Therefore, the prohibitions contained in § 901, under which the present information was filed, have no other or wider purpose. It is true that the title of the act of May 17, 1898, ends with the not unusual form, "and for other purposes." Plainly, as the trial justice held in his opinion in the previous case against the plaintiff in error, this expression must be confined to objects of a like character. It is an elementary principle of law that general phrases following the enumeration of specific objects will be limited to matters *ejusdem generis. District of Columbia* v. *Reuter,* 15 App. D. C. 237, and cases cited.

3. The court erred in granting the prayer of the government, and in refusing to grant the prayers of the defendant. The Washington Gas Light Company was chartered by act of Congress in 1848, and was given specific authority to make gas of coal, oil, tar, pitch, etc. It is, like common carriers, a quasi public corporation of the highest importance. See *Manning* v. *Telephone Co.* 18 App. D. C. 213. Under the government's prayer a conviction is necessary no matter how minute the quan-

tity of tar and oil is, and no matter whether it is possible to separate it from the water or not. The ruinous effect of such a construction of the statute upon business in the District of Columbia is too evident to require discussion. Indeed, under such a construction, the information and prayer might with equal force apply to pure water, if the same was a waste product of the gaslight company, as, indeed, it is. See *United States* v. *Kirby,* 7 Wall. 482; *Carlisle* v. *United States,* 16 Wall. 147; *Chew Heong* v. *United States,* 112 U. S. 536, 554, 555; *Lau Ow Bew* v. *United States,* 144 U. S. 47; *Holy Trinity Church* v. *United States,* 143 U. S. 457; *Hawaii* v. *Mankichi,* 190 U. S. 197; *Knowlton* v. *Moore,* 178 U. S. 41, 77; *River Ribble Joint Committee* v. *Halliwell,* L. R. 2 Q. B. Div. 385.

4. Congress has an undoubted right to repeal the charter of the Washington Gas Light Company. This it has not attempted to do. Until it shall do so, the company has the right, and indeed a duty is imposed upon it by law, to discharge its functions as a public-service corporation. If in so doing it necessarily offends the strict letter of the statute, the statute must be so construed as to permit an unavoidable exception. The only alternative would be to declare the entire section void. This the court would necessarily do upon satisfactory evidence that the gas company could not continue its business if the statute were to remain in force. *Bradley* v. *District of Columbia,* 20 App. D. C. 169. So, if the act would impose such expense that gas could not be made at a profit. *Smyth* v. *Ames,* 169 U. S. 466, and cases cited; *San Diego Land Co.* v. *National City,* 174 U. S. 739.

*Mr. Morgan H. Beach,* United States Attorney for the District of Columbia, and *Mr. Charles A. Keigwin* and *Mr. Alexander R. Mullowny,* Assistants, for the appellee.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

This case comes from the police court on writ of error. An information was filed by the United States against the defend-

ant, Thomas F. Holden, on the 24th day of October, 1902, alleging the violation by the defendant of § 901 of the Code of the District of Columbia, providing against the pollution of the waters of the Potomac river and its tributaries, within the District of Columbia.

The information filed on the 24th day of October, 1902, alleges that, on the 15th day of October, 1902, the defendant did, then and there, unlawfully allow a certain waste product, to wit, water mixed with tar and oil of the gas works of the Washington Gas Light Company, situate at the foot of Twelfth street, southeast, in the city of Washington, in said District, to flow into and to be deposited into a certain tributary of the Potomac river, within said District, known by the name of the Anacostia river, and also known by the name of the Eastern branch of the Potomac river, against the form of the statute, etc.

To this information the defendant appeared, and pleaded not guilty, and waived a jury trial. A trial was had before the court, at which a bill of exception was taken to various rulings of the court, and, the defendant having been found guilty, he was sentenced as prescribed by the law, and he thereupon applied for and obtained a writ of error to this court.

At the trial, the government produced testimony tending to prove that on the 10th day of September, 1902, certain specimens of water mixed with oil and tar were taken by one Lohman from the Anacostia river, which is a tributary of the Potomac river, in the District of Columbia, at a point where a certain discharge of water mixed with tar and oil is made from the premises of the Washington Gas Light Company into the water of the said Anacostia river; it being admitted by the defendant, Holden, that the said premises of the Washington Gas Light Company were then and there under his control, and that he was responsible for the said discharge.

It was further proved by the government that the said specimens had been analyzed by the District chemist, J. D. Hird, and that he found in one of the said specimens taken at the point in question 2.55 per cent of coal tar; and that the process used in obtaining the result was by extraction with a chemical

substance known as Xylod, which then evaporated, and the result weighed. That the process was carried on in a room at a temperature of from 15.5 to 18 degrees centigrade, which is equivalent to about 65 degrees Fahrenheit. And further gave evidence tending to prove that at other times water mixed with tar and oil flowed from the gas works of the defendant into the said Anacostia river, but produced no samples of said water so mixed, and offered no analysis thereof.

The defendant then testified in his own behalf, and gave evidence that the only discharge of water from the gas works in question into the Anacostia river is from what is called the filtering basin, thereafter described, and that said filtering basin has no connection whatever with any refuse matter from the manufacture of coal gas, and that no such refuse matter from coal gas is discharged in the Anacostia river, but only refuse matter from water gas. The witness then described the gas works on the premises, and the manner in which they are operated in the manufacture of gas, as follows:—

"We first manufacture what we call water gas or hydrogen gas in certain generators. The cupola, a certain part of the apparatus, is filled with fuel, and brought up to an incandescent heat. Then a flood of steam is let into that body of fuel, whereby the carbon is displaced, and the result is a hydrogen or straight water gas. That goes into what is called a relief holder. Then the gas, as it is needed, is taken out and run through illuminators, which are nothing more than wrought-iron boxes. In these boxes are eleven zig-zag trays, and on each tray are about 11 feet of 1-inch steel coil. The object of that is to heat the illuminators up to 300 degrees Fahrenheit, if possible. Then oil is mixed for the first time with gas in the illuminator. The hydrogen gas comes out of the relief holder, and enters at the top of the illuminator with the oil. When that gas leaves the illuminator it is conducted to what are called benches, containing the retorts and the fixing chains, and it is fed through the retorts. There are 42 retorts in one stack, and then the gas goes up the standpipe and down into a hydraulic main. In that hydraulic main there is an air-tight seal, and the gas comes in

from the retort. A water seal is maintained there in order to prevent the gas from getting back into the retort. It is necessary to supply a certain amount of water to make up for the evaporation, and to keep the temperature for the hydraulic main normal,—that is, at a proper degree of temperature to allow the gas to mix. In that way there is a deposit of coal tar. This is the tar that is in the gas, and as it comes down the drip pipe it drops to the bottom. The tar runs off into what we call a water-gas tar well, which is of 15,000 gallons capacity. Coal tar is the product which results from the use of oil in the process of manufacturing water gas." The construction and operation of the works are illustrated by a series of maps or drawings used in evidence, and which appear in the record.

There were many witnesses examined for the defendant,— some to show that it was not practicable to manufacture gas of the character manufactured at the gas works in question without producing waste products of tar and oil, and that it was not practicable, in the operation of the works, to prevent the discharge of some quantity of such waste products into the waters of the river. There was much expert evidence given to show the volume of water in the river where the waste matter was discharged therein, and the action of the currents in the river upon such waste matter, and to what extent the pollution of such waste products could be traced in the water by color or otherwise, or whether the effect of such waste products was of a deleterious character or not.

The principal expert witnesses on the part of the defense were Professors Wiley and Monroe, professional chemists; and their testimony was quite full as to the extent of the waste products discharged and their effect upon the water of the river. The testimony of Professor Wiley is quite exhaustive upon the subject, and we shall quote somewhat at large from his testimony in order to show the extent and effect of the discharge of the waste products into the river, of which complaint is made.

Dr. Wiley says: "I am a chemist, and am chief of the Bureau of Chemistry of the Department of Agriculture, and have been such for nearly twenty years. I have practised my

profession as a chemist for twenty-seven years. I have visited the gas works in question on several occasions, and have a general knowledge of the method in which the process of manufacturing water gas is carried on there.

"Water gas in general is produced by passing superheated steam over carbon at a high temperature, producing decomposition of the water, the union of the hydrogen with the carbon forming hydrocarbons. These are afterwards saturated with low-boiling gasoline, or a petroleum product, which is called carburetting, in technical language, which adds to the water gas a certain element from the gasoline, a gaseous element. This mixed gas is afterwards fixed by passing through retorts at a temperature more or less elevated, which makes it a permanent gas, so that on cooling it does not separate out.

"The necessary refuse is water, a certain quantity of ammonia, and a certain quantity of a mixed material composed of a great many different substances, known as coal tar.

"I have measured the water which is discharged into the Anacostia river at the gas works in question, as a necessary refuse of this process, and I find it to be a gallon in four seconds,—the total discharge of waste products. That includes all waste products; a gallon in four seconds, or 15 gallons a minute, or 900 gallons an hour. This seems to be a necessary refuse. I do not see how the process could be carried on without this product or effluent. The water must flow out. I do not know that it could be any less in quantity. I am not sufficiently familiar with the technical details, and so I know there must be a certain quantity. Whether it could be made less or not, I could not say."

        *        *        *        *        *        *        *

"I made an investigation of the methods of separating the coal tar in the effluent from the waters, independently of Mr. Monroe's investigations, although we were together most of the time; but we made our investigations entirely independently. I noticed the apparatus which was used for separating the coal tar, the method of recovering the coal tar, and also the way in which the effluent water was finally discharged into the river. I took samples of the various products which were in the effluent

tube, which I have in the court here. I call the effluent tube the pipe which comes from the gas works and empties into the puri-fying tanks,—the tube which brings this kind of material which I have collected at the tube. I mean the tube that runs directly from the works into these tanks. There are 6 tanks and then there is one large pond, the final pond. There are two sets of 3 tanks each. The water comes from the gas works into these settling tanks and it bears a certain quantity of coal tar, a con-siderable quantity, which is easily seen with the naked eye. In this tank a portion of the tar settles to the bottom. It goes down here, and a portion remains on top. It is so arranged that nothing on the top can flow into the next tank, because this tube which conducts over here dips down underneath the surface. It comes down like that, so that the tar that settles does not go through there (indicating), and the tar that rises to the top does not go in there; and this top tar is taken off from time to time with a shovel,—skimmed off with a thin shovel. Any tar that passes through there by sinking, as some of it may, of course, comes into this tank and goes through the same process, and so on successively, each one being constructed exactly like the other, and having no connection between them except this pipe. These settling tanks are all constructed alike, exactly in the same way. It is so arranged that nothing at the bottom and nothing at the top can go into these pipes, but only what is in between, unless the oil on top should come down below the mouth of the pipe.

"After it has left the 6th one of the settling tanks, it passes through a tube into the filtering basin. There it simply runs in and passes on and comes out at the exit. There is no separa-tion of any kind there except gravity, anything that comes to the surface or settles to the bottom. It goes from the filtering basin into the river, at the rate I have specified,—900 gallons an hour. Anything that is on the surface would go along with the water and out into the river."

The witness then describes the samples of the water taken by him, and the location from which taken. He took five samples on the 13th of October, and two more on the 29th of that month.

He then says he made analysis of Nos. 3, 4, and 5 of these samples.    No. 3, he says, is the water as it flows from the filtering basin into the river.   "I found," says the witness, "that it contained a certain quantity of what we call solid matter, and a considerable quantity of ammonia; and I did not measure the coal tar in that.   I assume that it contained a trace of coal tar. I did not measure the coal tar there, because the appearance of it to me showed that it was such an infinitesimal quantity, almost, that it was almost impossible to determine it.   I assumed that it contained traces of coal tar, because it had been previously mixed with coal tar, and the impossibility of absolutely making a separation in that case was apparent.   So if it had been once mixed with coal tar, the process of settling and separation, no matter how perfect it is, will never chemically purify the water so as to make it absolutely free of every trace of coal tar. I did not measure it at the time, because it seemed almost a hope-less task to undertake it; but I have measured it in the sample that I took from the same source yesterday.   What I went for yesterday was to get another sample for the purpose of seeing if I could determine the amount of coal tar in it."

Then referring to the sample of the water taken the day previous to the day on which he was testifying, the witness said that sample was taken from the same place that No. 3 was taken.   "I have made an attempt, and I think a successful one, to measure it.

"I measured the quantity of coal tar in this in two ways.    I first obtained some of the coal tar as free as I could from water, as it came from the effluent tube, by skimming the coal tar to get it as free as possible from water.   I got this sample as it came out of the effluent tube into the first settling tank.    That represents, in my opinion, pretty nearly pure coal tar, as nearly as you could get it by just lifting it off in the most careful manner from water.   It floats on top at first, and I got it just as it came out of the factory.   I should say that this was probably 30 or 40 per cent of coal tar, and may be 60 or 70 per cent of water in it."   He then describes the solvents used to dissolve the coal tar, and the result of his experiments with the solvents

used. And he then stated the result of his experiments thus:
"I then separated this and evaporated it, exactly as I have told
you; and I recovered, by the chloroform, 16 milligrams of coal
tar. Here it is. About three drops. That is 16 parts per
million. Now, I think I am able to testify to this court that
1,000,000 gallons of this liquor flowing into the river would
carry 16 gallons of coal tar. I think I have demonstrated that.
If you measure that in percentages, it is less than one-
hundredth of 1 per cent."

The same witness, on re-examination and in conclusion of his
evidence, says "that, while the water discharged from the filter-
ing basin would itself be detrimental to fish, and he did not be-
lieve fish could live therein, its mixture with river water would
probably be beneficial, even to the fish; that at a distance of 50
feet, the sample which he had taken by scooping off from the
top of the water might harm fish in that little estuary, because
it is very narrow there and very concentrated, and he took the
water right from the surface so that he got mostly effluent
water; that, in other words, he fished up that warm water,—
scooped it up. The water was still warm. That he took the
sample purposely from the top so as to get the effluent water.
But that at a distance of 200 feet from it, it would certainly not
be harmful to them."

There were several other witnesses examined as to the con-
dition of the water, and how it was affected by the discharge
therein of the waste products from the gas works. But in the
view we have of this case, and the necessary determination
thereof, it is quite unnecessary to recite any more of the evi-
dence; or to decide any of the several questions as to the ad-
missibility of evidence raised on the trial. Those questions, in
our view, are quite immaterial to the determination of the case.

There is one question, however, of a preliminary character,
which would appear to be necessary to decide, before consider-
ing the main question of the case, and that is a question that
goes to the right of the government to maintain the prosecution
on the present information. After the trial had commenced,
and the government had given its evidence in chief, and some

progress had been made in the production of the evidence in defense, a preliminary question was raised as to the validity of the proceeding on the present information, to which the defendant had appeared and pleaded, and put himself upon trial, without making any question as to the validity of the proceeding.

It appears that there had been a prior information filed in respect to the same offense, to which the defendant had appeared and pleaded not guilty, and demanded a jury trial. In the course of the trial on the present information, in reply to a question of counsel for the defendant, it was stated by the counsel for the government that the first information, filed in the case, charging the defendant with committing, on the 6th day of August, 1902, substantially the same misdemeanor as that charged in the present information, had been withdrawn, and the present one substituted in lieu thereof, to which second information the defendant had pleaded not guilty, and waived a jury trial. Whereupon counsel for the defendant moved the court that the defendant be discharged, on the ground that he had no knowledge of the filing of the present information; that there had been no service of process on the defendant under the present information; that counsel had no authority from the defendant to plead to said information, and that they supposed that the plea was to the original information. And it was offered to be proved that the defendant had no knowledge of the filing of the present information; that he had not authorized any attorney to plead to the same for him, and that no process thereunder had been served upon him. But the court overruled the motion, and the defendant excepted to the ruling.

We can perceive no possible ground upon which the motion could have been sustained. The defendant had appeared to the present information and pleaded not guilty, and waived a trial by jury. He had gone to trial on that state of the record, without moving to quash the information, or raising any question as to the regularity of the proceeding. He simply moved to be discharged without further proceeding. For this no principle can be invoked of which we are aware. As declared by the Supreme Court in the case of *Ker* v. *Illinois,* 119 U. S. 440, 30 L. ed.

423, 7 Sup. Ct. Rep. 225 : "We do not intend to say that there may not be proceedings previous to the trial, in regard to which the prisoner could invoke in some manner the provisions of this clause of the Constitution, but, for mere irregularities in the manner in which he may be brought into the custody of the law, we do not think he is entitled to say that he should not be tried at all for the crime with which he is charged in a regular indictment. He may be arrested for a very heinous offense by persons without any warrant, or without any previous complaint, and brought before a proper officer, and this may be in some sense said to be 'without due process of law.' But it would hardly be claimed that, after the case had been investigated and the defendant held by the proper authorities to answer for the crime, he could plead that he was first arrested 'without due process of law.'"

And so by the same court it was said, in the case of *Mahon* v. *Justice,* 127 U. S. 700, 708, 32 L. ed. 283, 286, 8 Sup. Ct. Rep. 1204 : "The jurisdiction of the court in which the indictment is found is not impaired by the manner in which the accused is brought before it. There are many adjudications to this purport cited by counsel on the argument, to some of which we will refer;" and the court then refers to several cases in which that principle was held as well established in the law. In view of this principle, as well as the general principle that a party must be taken to know and understand the effect of his appearing, pleading to, and going to trial on an information, the motion of the defendant that he be discharged from further prosecution was properly overruled.

At the conclusion of the evidence the government submitted the following proposition of law for the guidance of the court, which was adopted by the court, and applied in its decision: "If the court believes from the evidence that the defendant, Holden, as superintendent of the Washington Gas Light Company, doing business in said District, allowed, on the 15th day of October, 1902, a certain waste product of said gaslight company and gas works, consisting of a certain percentage of tar and oil of said gas works, to flow with water into the Anacostia

river, a tributary of the Potomac river, in said District, then its judgment should be that of guilty."

The defendant objected to the granting of this proposition, on the ground, as stated in the bill of exception, that said prayer literally interpreted the provisions of § 901 of the Code of the District, and assumed that any discharge of refuse water containing any percentage of tar and oil into the water of the Potomac river or its tributaries was prohibited thereby. But the court overruled the objection, and adopted the prayer; and the defendant excepted.

The defendant, upon the whole evidence, offered twelve propositions for the guidance of the court in the determination of the case. All these propositions, with slight variations, present the same grounds of defense, and they are all the converse of the proposition granted at the instance of the government; and they were all, consequently, rejected by the court; to which rejection the defendant excepted. It is unnecessary to state them all *in extenso;* we shall state only a few of them, as representing them all.

1. By the first, the court was asked, upon the whole evidence, to acquit the defendant.

2. By the second, the court was asked to affirm, that the fact that the defendant, on the occasion referred to in the evidence, caused water mixed with tar and oil to flow from the gas works into the river, if such be found to be the case, was not sufficient to convict the defendant, unless the court should further find that the water so mixed with tar and oil was, after it had mingled with the water of the river, injurious to fish, or to any spawning ground of fish in said river.

3. By the third of the defendant's prayers, the court was requested to declare that, if it should be found from the evidence that the defendant, on the occasion in question, caused to flow from the said gas works 1,000,000 gallons of water, mixed with not more than 18 parts, in said 1,000,000, of tar and oil, at the rate of 900 gallons per hour, and that the same flowed into and mixed with the water of the river, then the defendant should be acquitted.

4. By the fourth of said prayers, the court was requested to declare that, if it should find that the tar and oil which the defendant allowed to flow into the river from the gas works were in a state of complete solution with the water with which it was mixed, and would not become dissolved from the water unless treated chemically, then the defendant should be acquitted.

8. By the eighth prayer, the court was requested to affirm as law that, if it be found as a fact that the defendant had used, in the conduct of the gas works, on the occasion in question, all reasonable diligence in eliminating the waste products of tar and oil, and that upon said occasion he only discharged into said river so much tar and oil mixed with water as could not, by reasonable diligence, and by the use of reasonable processes, be eliminated from such water, then the defendant should be acquitted.

10. By the tenth prayer, the court was asked to affirm that the provisions of § 901 of the Code of this District do not apply to the necessary operation of the gas works in question, in the manufacture of gas in this District, and in discharging the refuse thereof in the river, and therefore the defendant should be acquitted.

11. And by the eleventh prayer, the court was directed to declare that, if it was shown by the evidence that the defendant, on the occasion in question, discharged into the river only so much refuse water mixed with tar and oil as was required to be discharged by the necessary operation of the gas works in the manufacture of gas, the defendant was entitled to be acquitted.

There were other prayers offered by the defendant, but they embraced substantially the same propositions as the prayers we have recited. It is unnecessary, therefore, to recite more of them.

The Washington Gas Light Company, the discharge of the waste products of which was complained of, was incorporated by an act of Congress of July 8th, 1848 (9 Stat. at L. 722, chap. 96), and by its act of incorporation it is authorized to manufacture, make, and sell gas, to be made of coal, oil, tar, peat, pitch, or turpentine, or other materials, and to be used for

the purpose of lighting the city of Washington or the streets thereof, and any buildings, manufactories, or houses therein, etc.; but the said company is required to so conduct the said manufacture of gas as not to injure private property, or create a nuisance; and provided further, that the right to erect or put up any buildings, works, or apparatus for the manufacture of gas, shall be subject to such terms, conditions, restrictions, and regulations, as the said corporation of Washington may or shall from time to time prescribe or require.

Congress has legislated in several acts for the protection of the waters of the Potomac river and its tributaries, within this District, against pollution or defilement; some of the provisions of which acts would seem to have been specially intended for the protection of fish in those waters. All the existing legislation upon the subject has been codified, and is now found in the Code for this District, adopted by act of Congress, which went into effect on the 1st day of January, 1902. These acts of Congress are embraced in certain sections of the Code; but it is § 901 under which this information is prosecuted. That section embodies § 6 of the act of Congress of May 17, 1898, entitled "An Act for the Protection of Fish in the District of Columbia, for the Maintenance of a Permanent Spawning Ground in the Potomac River in said District, and for Other Purposes." [30 Stat. at L. 415, chap. 338.]

The § 6 of the act of 1898, embodied in the Code as § 901, is general in its provisions, and is intended as a penal prohibition against the pollution of the waters of the Potomac river, or any of its tributaries, in the District, by any of the means mentioned in the section. The section, with its index words, is as follows:

"Section 901. Deposits of Deleterious Matter.— No person shall allow any tar, oil, ammoniacal liquor, or other waste products of any gas works or works engaged in using such products, or any waste product whatever of any mechanical, chemical, manufacturing, or refining establishment, to flow into or be deposited in Rock creek, or the Potomac river, or any of its

tributaries within the District of Columbia, or into any pipe or conduit leading to the same."

It is fully conceded in the evidence, as also by the terms of the prayers offered by the defendant, that there was waste product consisting of tar and oil discharged from the gas works, under the control of the defendant into the Anacostia river. The question then arises, How much, if any, of such waste product can be discharged into the river with impunity, and in disregard of the provisions of the statute, not by the defendant alone, but by any and all of the various establishments using and discharging such waste products within the District of Columbia? If one manufacturer or person using such products can be allowed to discharge such waste materials in the waters of the Potomac river or its tributaries, then all must have a similar right, no matter how many such establishments or persons may be using and discharging such prohibited products; and the aggregate quantity thus discharged might be enough to produce a most offensive and dangerous pollution of the waters. If it be allowable at all, under the statute, to discharge any such waste product, by whom and how is the quantity to be gauged, and under what circumstances can it be allowed? Is the jury in each case to be allowed to make a law for itself, and say when, and when not, allowable, and, if allowable, in what quantity the product may be discharged in the waters of the District? And if the question be open as to the right of a party to allow some discharge of such waste product into the river, dependent upon what he may claim to be reasonable, then, upon his right being questioned by public authority, how is his right to be determined? Is the discharge of waste matter in each particular case, and the effect thereof upon the water to be ascertained by measurement, not only of the quantity of the waste product discharged, but of the volume of water into which the discharge is made, and then to be followed by the gathering of specimens or samples of the water, and the exhibition of conflicting analyses thereof by expert chemists, that each party may employ? We think not, and we think such was not the intention of Congress in enacting the law. It was

the manifest object of Congress, not simply to provide for the protection of the fish in the river, but for keeping the waters of the streams in the District as free from pollution as possible. Hence it was declared by the statute that "no person shall allow *any* tar, oil, ammoniacal liquor, or other waste products" to flow into, or to be deposited in, the rivers mentioned, or any of the tributaries, "or into any pipe or conduit leading to the same." The prohibition therefore is general and unqualified, and applies to all alike. There can be no question of the power of Congress over the subject; it is simply a question of police regulation.

It is urged, however, that, if the statute be strictly and literally enforced, it will virtually render it impracticable to manufacture gas for the use of the city. If that be so, it is a consequence much to be regretted. But that is a subject, not for the courts to control, but for Congress, the law-making power. The statute is plain and unambiguous in its terms; and it would be going to an unwarrantable extent for the courts to attempt to restrain and qualify the plain and unambiguous words of the law, upon the theory that the statute as enacted by Congress might, if strictly enforced, injuriously affect any particular interest subject to its operation.

The rule of construction upon this subject is old and well established. That is, as declared by the Supreme Court, that where a statute is of doubtful meaning and susceptible upon its face of two constructions, the court may look into prior and contemporaneous acts, the reasons which induced the act in question, the mischiefs intended to be remedied, the extraneous circumstances, and the purpose intended to be accomplished by it, to determine its proper construction. But where the act is clear upon its face, and when standing alone it is fairly susceptible of but one construction, that construction must be given to it. The whole doctrine, says the Supreme Court, applicable to the subject, may be summed up in the single observation, that prior acts may be resorted to, to solve, but not to create, an ambiguity. *Hamilton* v. *Rathbone,* 175 U. S. 419, 421, 44 L. ed. 221, 222, 20 Sup. Ct. Rep. 155.

The exposition of the principle is nowhere found more lucid·ly stated than by Chief Justice Marshall, in the case of *United States* v. *Fisher,* 2 Cranch, 358, 2 L. ed. 304. In that case it was said by the chief justice that, where the intent is plain, nothing is left to construction. Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived; and in such case the title claims a de-gree of notice and will have its due share of consideration. He then states the principle fully, and says: "The mischiefs to re-sult from the construction on which the United States insist, have been stated as strong motives for overruling that construc-tion. That the consequences are to be considered in expound-ing laws, where the intent is doubtful, is a principle not to be controverted, but it is also true that it is a principle which must be applied with caution, and which has a degree of influence de-pendent on the nature of the case to which it is applied. Where rights are infringed, where fundamental principles are over-thrown, where the general system of the law is departed from, the legislative intention must be expressed with irresistible clearness to induce a court of justice to suppose a design to ef-fect such objects. But where only a political regulation is made, which is inconvenient, if the intention of the legislature be expressed in terms which are sufficiently intelligible to leave no doubt in the mind when the words are taken in their ordi-nary sense, it would be going a great way to say that a con-strained interpretation must be put upon them, to avoid an in-convenience which ought to have been contemplated in the legislature when the act was passed, and which, in their opinion, was probably overbalanced by the particular advantages it was calculated to produce. Of the latter description of incon-veniences, are those occasioned by the act in question. It is for the legislature to appreciate them. They are not of such magni-tude as to induce an opinion that the legislature could not in-tend to expose the citizens of the United States to them, when words are used which manifest that intent."

There are many cases in which the same principle is stated and applied by the Supreme Court of the United States, but it

is unnecessary to make special reference to them. Many of them are referred to in the briefs of counsel.

Upon full consideration of the whole case, we are of opinion that there was no error in the judgment of the court below, and that its judgment should be affirmed; and it is so ordered.

*Judgment affirmed.*

A petition by the plaintiff in error to the Supreme Court of the United States for the writ of certiorari was denied by that Court.